IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2016 Session

# IN RE PROMISE A., ET AL.[1]

**Appeal from the Juvenile Court for Montgomery County**
**No. 151290, 151291          Timothy K. Barnes, Judge**
_____

**No. M2015-02144-COA-R3-PT – Filed March 16, 2017**
_____

The Department of Children's Services received custody of two children as a result of a petition it filed to have the children declared dependent and neglected; the children's mother had died, and they were unable to be placed with their father due to uncertainty regarding his paternity of the children and housing arrangement.  After custody was granted to the Department and a permanency plan developed, the father established his paternity; the permanency plan required that he continue to address his housing and employment situations, among other matters.  Eleven months after the children came into custody, the Department filed a petition to terminate Father's rights on the grounds of abandonment by failure to visit or support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistence of conditions.  After a trial, the court found that clear and convincing evidence existed as to all grounds and that termination was in the best interest of the children. Father appeals, contending that the evidence preponderates against various findings of the court, that the evidence does not support a conclusion that any of the grounds were established, or that termination is in the children's best interest.  Inasmuch as the children were not removed from the Father's home at the time they came into the Department's custody, we reverse the judgment terminating the Father's rights on the grounds of persistence of conditions and abandonment by failure to provide a suitable home; in all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part; Case Remanded**

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Taylor R. Dahl, Clarksville, Tennessee, for the appellant, Raymond  S. A., Sr.

Herbert H. Slatery, III, Attorney General and Reporter; Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.  FACTUAL AND PROCEDURAL HISTORY

This is an appeal from the termination of Raymond A.'s ("Father") rights to his two children:  Promise A., born September 2007, and Raymond A. Jr. born June 2008. The Department of Children's Services ("DCS") became involved in May 2014, when it received a referral that the children's mother had been hospitalized and, as a result, the children were unsupervised.  On May 23 the children's mother passed away; that same day DCS filed a Petition to Adjudicate Dependency and Neglect.  Pertinent to the instant appeal, the petition alleged:

> The father to the two younger children is [Father] and he lives in Clarksville, Tennessee.  It is unknown where the father lives, but it was reported he lives in a motel.
> * * *
> [Father] reported that he was the father of Raymond Jr. and Promise. . . . [Father] stated that he was not in a relationship with [Mother], but he visited the children every other weekend.  He reported seeing the children a month ago.  [Father] stated there was no court order for visitation. [Father] reported that he moved to Clarksville, TN from Texas along with [Mother] and the children.  He reported that he currently is staying with a friend and does not have a place of his own. . . .
> * * *
> [Father] admitted to past prescription drug use, but denied current use. [Father] consented to a drug screen and tested negative for all substances tested for.   [Father] admitted to past prescription drug use, but denied current use. . . .
> * * *
> CPSA Williams contacted Texas Department of Family and Protective Services. Tamala with DFPS reported that [     ] was listed as being the father of [     ]; [Father] was listed as being the father of Raymond A. and that the father of Promise was not listed.
> * * *

2

[Mother's sister] stated that [Father] was good with children, but that he was not capable of providing for the children financially. She reported that [Mother] stated to her that [Father] was not the biological father of any of the children. She reported that according to [Mother], [Father] was aware that he was not the children's biological father. She reported that [Mother] stated that [Father] signed both Promise and Raymond Jr's birth certificate but she was not aware if this was true. She reported that . . . Promise and Raymond's father's name is Chris.

* * *

[Father] reported that [Mother] . . . advised that he was not biological father of Promise. [Father] reported hearing in the past that he was not the biological father of Promise. [Father] asked the worker if he was able to take a paternity test to determine paternity.

* * *

CPSA attempted to obtain the birth certificate of Promise and Raymond. [Father] nor any of the other family members were able to provide the department with definitive proof who the legal father of any children [sic] is. Due to all three children left without a caretaker, DCS placed them in state's custody.

A protective custody order was entered placing the children in the custody of DCS and setting a preliminary hearing on the petition for May 27.[2] On October 2, 2014, a hearing was held on the dependent and neglect petition; the court found clear and convincing evidence that the children were dependent and neglected and continued custody with DCS.

The first permanency plan was developed on June 20, 2014; the first permanency goal, with a target date of December 8, was "return to parent," and the secondary goal was "exit custody with relative." The plan, *inter alia*, required Father to pay support for and attend all scheduled visits with the children; have a drug and alcohol assessment and comply with any recommendations; be subject to twice-monthly drug screens; demonstrate an ability to provide the children with a safe home environment and meet their basic, physical, and medical needs; have a legal source of income; and complete a paternity test. A second permanency plan was completed on October 22; the plan continued many of the requirements of the first plan, maintained the primary goal of return to parent, and changed the secondary goal to adoption. The second plan modified the first by adding the requirements that Father implement the recommendations from the alcohol and drug assessment he took, complete a psychiatric intake and assessment and random drug screens, and that he participate in the Parenting Education class through Family Support Services.

---

[2] The record does not reveal the result of the May 27 hearing.

DCS filed a petition to terminate Father's rights on April 9, 2015, alleging as grounds: persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3); abandonment by failure to visit, support, or to establish a suitable home pursuant to section 36-1-113(g)(1); and substantial non-compliance with permanency plans pursuant to section 36-1-113(g)(2). The petition also alleged that termination was in the children's best interest. Father was appointed counsel, and a guardian *ad litem* was appointed.

A hearing was held over two days in September 2015, at which DCS family service worker Lawanna Hassan, the children's foster father, and Father testified. At the completion of the hearing, the court stated its factual findings and that termination of Father's parental rights was in the best interest of the children, and terminated his rights on the grounds of failure to visit or support, persistence of conditions, substantial noncompliance with the permanency plans, and failure to establish a suitable home; an order was entered on February 4, 2016, memorializing the oral ruling.

Father appeals, articulating the following issues for our review:

1. Whether there is clear and convincing evidence to support the termination of parental rights on any of the grounds enumerated, specifically whether there is clear and convincing evidence of substantial noncompliance with the permanency plan, abandonment by failure to provide a suitable home, abandonment by failure to visit and support, or persistence of conditions.
2. Whether there is clear and convincing evidence to support that termination of the Father's parental rights was in the best interests of the minor children.
3. Whether the Father's lack of counsel in the dependency and neglect adjudicatory hearing, which directly preceded the termination of parental rights proceeding, violated the Father's right to due process, as due process requires States to provide parents with fundamentally fair procedures.
4. Whether the Department of Children's Services provided reasonable efforts to reunify the children with their Father.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a

4

parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann.§ 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.*

## III. ANALYSIS

### A. Grounds for Termination

The trial court found that the following statutory grounds for termination were established: abandonment by failure to visit, failure to support, and failure to provide a suitable home; that the conditions which led to the children's coming into DCS custody persisted; and that Father was in substantial noncompliance with the permanency plans. Father challenges the court's holdings with respect to each ground for termination.

#### 1. Substantial Noncompliance with Permanency Plans

A ground for termination is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). Elaborating on this ground in *In re M.J.B.*, this Court has stated:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-

113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.,* 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.,* No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

140 S.W.3d at 656–57. Whether there has been substantial noncompliance with a permanency plan is a question of law, reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

With respect to the ground of substantial noncompliance, the trial court made the following findings of fact:

> At the outset, the Court finds that the requirements under the permanency plans for [Father] were clearly reasonable and related to remedying the conditions that warranted foster care for the children. This Court previously made such a finding when ratifying the permanency plans on July 29th, 2014 and April 1st, 2015. The Court finds that [Father] was given multiple copies of these plans; it believes the testimony was five copies were given to [Father]. [Father] knew what his obligations in the permanency plans were and the tasks that he was asked to do, were not done in a timely manner. He was asked to do an A&D assessment in July 2014. He finally completed that, according to his own testimony, a couple of months ago, which the Court would assume is July of 2015, over a year later.

> He was asked to provide prescriptions and participate in random drug screens. His testimony during this hearing was that he does not have prescriptions, but apparently he provided no proof that this is true. He was asked to provide random pill counts. His own testimony was that he did not do that. He has not provided any proof of a legal means of income. He has not provided a lease agreement or any proof of showing that he has stable housing.

6

The Court would find that [Father] was offered the assistance of the department of Children's Services in finding suitable housing and that he consistently turned down that help and further did not avail himself to [sic] DCS for further help, much the same way that he did not avail himself to [sic] the help of his attorney early on.

The Court therefore finds that [Father] has made no progress towards accomplishing the tasks under the permanency plans. DCS clearly made reasonable efforts as described above to assist [Father], therefore, [Father] is in substantial noncompliance with the permanency plan obligations.

Father argues that the trial court's finding that the requirements of the permanency plans were reasonable and related to the remedying the conditions that caused the children's removal in the first place is unsupported because "the condition that caused the children to be removed . . . was the death of their mother and Father's inability to immediately produce their birth certificates." This is not a complete or accurate statement of the circumstances upon which the children came into DCS custody.

While the children's mother's death was the precipitating factor in their coming into DCS custody, it was not the sole factor. The interviews and investigation conducted by DCS produced, in addition to uncertainty regarding the paternity of the children, concerns about Father's housing situation, drug use and criminal history, as noted in the allegations of the petition quoted at section I, *supra*. As a result of taking custody of the children, DCS was required by Tennessee Code Annotated section 37-2-403 to develop a plan for each child that addressed the circumstances by which they came into custody; here those circumstances were the death of their mother and, in light of the uncertainty as to their father, the lack of a placement for the children.

For the reasons set forth below, we agree with the trial court that the requirements of the permanency plans were reasonably related to remedying the conditions that led to the children's not being placed with Father upon the mother's death. The first permanency plan was developed on June 20, 2014, with the first permanency goal being "return to parent," with the secondary goal of "exit custody with relative"; the target date was December 8. Pertinent to the issues in this appeal, the plan required Father to pay support for and attend all scheduled visits with the children; have a drug and alcohol assessment and comply with any recommendations, and be subject to twice-monthly drug screens; demonstrate an ability to provide the children with a safe home environment and meet their basic, physical, and medical needs; have a legal source of income; and complete a paternity test. A second permanency plan was completed on October 22; the plan continued many of the requirements of the first plan, maintained the primary goal of return to parent, and changed the secondary goal to adoption. The second plan modified the first by adding the requirements that Father implement the recommendations from the

7

alcohol and drug assessment he took and complete a psychiatric intake and assessment, that he submit to random drug screens, and that he participate in the Parenting Education class through Family Support Services. The permanency plans reflect these concerns, particularly Father's housing and employment situation, and set forth steps to assist Father in acquiring a more stable lifestyle.

Father also argues that the failure of his counsel in the dependent and neglect proceeding to attend the meeting where the permanency plans were developed deprived him of the opportunity to challenge some of the requirements of the permanency plans, thereby resulting in requirements that were not reasonable or related to the circumstances that led to the children being placed in DCS custody. He contends that these matters, along with the failure of the court to appoint counsel for him after permitting his counsel to withdraw in the dependent and neglect proceeding, resulted in a fundamentally unfair procedure.[3] We find no merit to Father's contention that the fact that he was unrepresented during a portion of the dependent and neglect proceeding rendered that proceeding or the termination proceeding unfair or deprived him of due process. This Court has previously held that "any deprivation of due process based upon the failure to appoint counsel during a dependency and neglect proceeding is remedied if the appellant is afforded full protection at the termination proceeding." *In re Arteria H.*, 326 S.W.3d 167, 183 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015) (citing *In re S.Y.*, 121 S.W.3d 358, 364 (Tenn. Ct. App. 2003)). Father was represented by counsel at all times during the termination proceedings; moreover, the reasonableness of the requirements of the permanency plans is an issue that was resolved by the trial court and that we consider in this appeal. The requirements of the permanency plans were reasonable and related to the circumstances and conditions that caused the children to come into DCS custody.

We now address whether the record clearly and convincingly supports the finding that Father was in substantial noncompliance with the permanency plans. Ms. Hassan testified that Father received both permanency plans; that she explained to Father that DCS could assist him with anything listed on the permanency plan but that Father "always stated that he didn't need any assistance"; that, with respect to Father, "[i]t doesn't seem like there's any concern to actually get the tasks done and there's no hurry to it"; that she requested a walk-through of the home since the . . . petition was filed, but he never gave us a time when we could come out to the home"; that Father did not visit the children until he received the petition to terminate his parental rights; that Father has never provided proof of income, but recently "stated that he's a clergyman and showed us his card and stated that he did not have to provide proof of income for that reason"; that she made several attempts to contact Father, including by phone and mail; that Father

---

[3] In his statement of issues Father refers to a due process right, which he contends "requires States to provide parents with fundamentally fair procedures."

complied with the request for a paternity test; that he completed a parenting assessment, which was paid for by DCS and which recommended that he take a parenting class;[4] that Father completed an "online four-hour parenting class," which Ms. Hassan had "no way to determine if it . . . would meet the criteria"; that Father provided proof of completing that class in the six months allotted only "two, maybe three months ago [before the hearing]";[5] that Father had provided no proof of a stable home or income, had attended no school meetings, doctors' visits, or otherwise participated in the children's lives, as required by the permanency plans.

The foster father, who was tasked with supervising visitation between Father and children, testified that there was no contact between father and children from January 2015, when the children were placed in his home, until April 2015, when the petition to terminate Father's parental rights was filed.

Father testified that he received both permanency plans and understood the criteria for terminating his rights, and that if he did not complete DCS's requests, the court could terminate his rights to his children. Father did not introduce evidence contrary to the testimony of Ms. Hassan or the foster father; rather he argues that he "actually completed numerous tasks," including the paternity test, alcohol and drug assessment, drug screens, parenting assessment, and a four hour parenting class.

Viewing the evidence as a whole, the tasks that Father completed were insufficient to establish substantial compliance with the permanency plans. The testimony shows that he completed many of the tasks only after the petition to terminate his rights was filed and in anticipation of the hearing on the petition. At the time of the hearing, he had not secured separate living arrangements or demonstrated "the ability to provide the children with a safe and nurturing home environment," as required by the plans but, rather, was

---

[4] Despite Father's contention that there is no testimony to support "the Juvenile Court ['s finding] that the F[amily] S[ervices] W[orker] specifically testified that DCS paid for a paternity test and she set up the alcohol and drug assessment for [Father] at Renewal House," we observe that Ms. Hassan testified that:

> The Department actually paid for the A[lcohol] & D[rug] assessment. We had a representative from Renewal House that would be in our office regularly. She actually went in and did the A&D assessment with [Father]. We also paid for the parenting assessment. We made several attempts to get ahold of him to ask if he needed assistance with other services and also provided our information so that, you know, we knew he had the information to contact us.

The court's finding is supported by this testimony.

[5] Upon our review of Ms. Hassan's testimony, we note that, shortly after giving the quoted testimony, she used the terminology "two, maybe three weeks ago." This misstatement is not material because Father provided the proof to DCS, at the earliest, in June of 2015, which was past the target completion date of April 22, 2015.

living with the people with whom he was living at the time the dependent and neglect proceeding was initiated and who had been rejected as a potential placement for the children.[6] The permanency plans required that he have a legal means of income, pay child support, and be able to meet the children's financial needs. He testified, however, that he had not provided proof of income to DCS and had not paid support; significantly, until the termination petition was filed, he had not attended his scheduled visitations. The evidence clearly and convincingly supports the finding that Father was in substantial noncompliance with the provisions of the permanency plans.

## 2. Abandonment by Failure to Visit or Support

Abandonment is listed as a ground for termination in Tennessee Code Annotated section 36-1-113(g)(1); that term is defined in Tennessee Code Annotated section 36-1-102(1)(A), which reads in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> \*\*\*
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The record is clear that during the four-month period preceding the filing of the termination petition, Father did not visit the children. He acknowledged that he did not visit them between September 2014 and May 2015 and asserts that this was not willful

---

[6] All persons living in the home in which Father was living were required to pass a background check and drug screen in order for the children to be placed with him. Father argues at length that DCS ran a background check on the wrong person: a Mr. F[.], instead of a Mr. G[.]. One person on which DCS performed a background check did not pass; Father was informed of this. Upon learning from Ms. Hassan that the children could not be placed in the home "due to Mr. F[.]'s background check," Father should have been alerted that the wrong name was used in the background check and communicated that to DCS. In any event, in light of the entire record, any error on the part of DCS in running the background check does not affect Father's responsibility to comply with the requirements of the permanency plan.

but was "largely due to communication difficulties between DCS and [Father], not due to willful failure." In support, Father cites testimony that he spoke with Ms. Hassan's predecessor[7] regarding one occasion in which he would not be able to exercise his visitation due to a flat tire and was advised by the caseworker that the worker "would try to rearrange it or we'll just go to the next visit, and the next thing I know he never called me back."

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), the court discussed willfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. . . .

*Id.* at 863–64 (citations and footnotes omitted). The record will not support a conclusion that Father's failure to visit his children was not willful.

The record is clear that Father knew that he could visit and in fact had visited; he did not testify that he was prevented in any way from visiting the children, and the record belies an inference that anything DCS did or did not do prevented him from exercising his visitation. Father had successfully exercised several visitations prior to September 2014, and it is disingenuous for him to contend on appeal that he needed counsel to "explain the process to him, for all of those visits" and that the lack of counsel explains away his failure to visit. The record supports a finding that his failure to visit was willful.

---

[7] Ms. Hassan assumed responsibility for this case in July 2014.

11

Similarly, the evidence of Father's willful failure to pay support is clear and convincing. Both Ms. Hassan and Father testified that he did not pay any child support. Father testified that he works, providing "tree service, lawn service, landscaping, drywall" but that he has never paid child support for the following reasons: he "was under the impression [he] was going to get [his] children back"; DCS was "going to send [him] some kind of verification of where I was supposed to send this money to," which he never received; and "it was very difficult" to both work and try to find another residence.

As to Father's reasons for not paying support, we note that the obligation to support one's children was clearly set forth I the permanency plan and does not abate because a parent believes he or she will regain custody. Second, contrary to Father's insistence, the payment address was provided in both permanency plans. Third, Ms. Hassan and Father both testified that DCS offered to assist Father with finding another residence, but he refused the assistance.

Accordingly, the record clearly and convincingly supports the termination of Father's parental rights on the grounds of abandonment by failure to visit and by failure to support.

### 3. Abandonment by Failure to Establish a Suitable Home and Persistence of Conditions

The grounds of abandonment by failure to establish a suitable home[8] and persistence of conditions[9] are predicated on the child being removed from the home of

---

[8] Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment, as defined at Tennessee Code Annotated section 36-1-102(1)(A), is a ground for termination of parental rights; the latter statute defines "abandonment" as follows:

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

(ii) *The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child*, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for

the person whose parental rights are sought to be terminated. This Court in *In re Navada N.* held that "this ground [of abandonment by failure to provide a suitable home] is inapplicable when the child is not removed from the parent at issue's home before being placed with DCS." 498 S.W.3d 579, 596-97 (Tenn. Ct. App. 2016), *no perm. app. filed* (citing *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *9 (Tenn. Ct. App. June 23, 2015), *appeal denied* (Sept. 25, 2015); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *5 (Tenn. Ct. App. Feb. 27, 2015)). Similarly, this court in *In Re Jayden B.T.* held the requirement to apply when the ground for termination asserted is persistence of conditions. 2015 WL 3876573, at *9.

Father testified that he was not living with the children's mother at the time the children were placed in foster care in May 2014. He testified that, prior to their removal, he had been visiting with his children "just about every other weekend," but he did not testify where the visits took place. He testified that he was living at a certain address since the time DCS became involved and that he was unable to prove that the children were his biological children because their birth certificates "were in the house where they

---

the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

(Emphasis added.)

[9] Tennessee Code Annotated section 36-1-113(g)(3) provides that persistence of conditions is a ground for termination:

(3) *The child has been removed from the home of the parent or guardian* by order of a court for a period of six (6) months and:
    (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
    (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
    (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

(Emphasis added.)

13

were staying." This testimony, as well as trial Exhibit 2,[10] establishes that the children lived in a different home from Father's. Inasmuch as the children were not removed from Father's home, these grounds for termination are not applicable, and we reverse the determination to the contrary.[11]

## C. Best Interest

Once a ground for termination has been proven, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[12] The list of factors in the

---

[10] Exhibit 2 contained the Protective Custody Order, entered May 23, 2014, and the Petition to Adjudicate Dependency and Neglect, filed the same day. In the petition, DCS alleged that "the mother's boyfriend, Rob P[.] . . . has stated he and the children are at the home where the mother and children lived."

[11] Although not establishing grounds for termination, Father's living situation and the circumstances by which the children came into DCS custody are relevant to the involvement of DCS and Father's compliance with the permanency plans, as well as the best interest of children.

[12] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe

14

statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). "The parties are free to offer proof of other relevant factors." *In re Carrington H.*, 483 S.W.3d 507, 523 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tennessee Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016) (citing *In re Audrey S.,* 182 S.W.3d at 878.). "The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative." *In re B.A.C.*, 317 S.W.3d 718, 727 (Tenn. Ct. App. 2009) (quoting *In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). As we consider this issue, we apply the instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

In making this determination, the trial court made the following findings relative to factors (1), (2), (3), (5), (8), and (9):

> Considering the factors in TCA 36-1-113(i), the Court finds that [Father] has failed to make an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to return home. [Father] is in the exact same position he was in when the children came into foster care. [Father] failed to effect a lasting adjustment after reasonable efforts by DCS to assist [and] that [a] lasting adjustment does not reasonably appear possible. [Father] has failed to visit the children or provide regular support for the children.

> The Court may also consider other factors when determining if termination of parental rights is in the children's best interest. The Court has heard the testimony of the resource parent, and would find that the children have been well situated in the D[.]'s home for over eight months.

and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

They have provided very well for the needs of the children and while in their home, the children have thrived. There has been a lapse in the children's behavior and conduct subsequent to the period of phone contact with [Father], during which time there was some acting out that involved one incident of Raymond Jr. acting out of character and writing on the wall. The father has showed very poor judgment in arguing with the resource parent and yelling over the phone and in front of the children. This would illustrate to the Court that [Father] is not equipped to appropriately care for the children and it is also a good illustration of who is acting on the children's behalf. Having heard the testimony and reviewed the evidence, the Court would find by clear and convincing evidence that the termination of [Father's] parental rights would be in the children's best interest.

From our review of the record, there is clear and convincing evidence in support of the above findings. With respect to factor (1), as discussed in sections A1 and A2, *supra*, Ms. Hassan testified at length about the conditions that prevented the children from being placed with Father, the efforts made by DCS to assist him in addressing the deficiencies identified, and his failure to remedy those concerns. As noted by the court, at the time of the termination hearing, Father was in the same situation he was in when the dependent and neglect proceeding began.

With respect to factor (2), Father cites to no evidence to support his argument that DCS "did not provide reasonable efforts when it first separated the children from [Father]." To the contrary, the testimony of Ms. Hassan establishes that DCS investigated the issues brought to light when contact was initially made; provided services to Father, including a parenting assessment, visitation transportation, and supervision; attempted to contact Father by phone and mail; attempted to visit his home; and orchestrated foster care. DCS made reasonable efforts to assist Father in making an adjustment of his circumstances and, despite those efforts, he failed to do so; the record fully supports trial court's findings that DCS's efforts were reasonable and that Father failed to make a lasting adjustment of his circumstances.

With respect to factor (3), Ms. Hassan testified that, other than the three visits in the summer of 2014, Father had no contact with the children, who asked about him and wanted to know why they were not visiting with him; that she attempted to contact him to set up more visitation and to let him know that the children were asking about him; that she was unable to get in touch with him. In the absence of Father's visitation, Ms. Hassan testified that the children "were doing wonderful . . ., had been progressing well in their therapy [. . ., and] were thriving in school."

With respect to factor (5), Ms. Hassan testified that, at the time the termination petition was filed, the children had been in their current pre-adoptive foster home for approximately four months, and that during that time:

16

. . . they were doing wonderful. They had been progressing well in their therapy. They were thriving in school. Promise['s]. . . reading grade. . . went from near failing to exceptional. Raymond Jr. was still having some difficulty in school but had progressed . . ., and it was noted at that point that he would be passing to the next grade.

The foster father testified that the children "were really doing well up until when the phone calls and the visits started" in May 2015.

Related to factor (8), there is testimony that Father frequently became agitated during encounters with Ms. Hassan; that, at one Foster Care Review Board hearing, bailiffs were called in because he had become aggressive in his behavior; and that he became agitated while on the phone with the foster parent and yelled at the parent. This is evidence of behaviors that are or could be detrimental to the children or put them in danger.

With respect to factor (9), Father acknowledged that he had not paid support for the children.

There is also significant evidence in the record with respect to factor (4). When asked whether a meaningful relationship appeared to exist between Father and the children, Ms. Hassan testified as follows:

> The children generally only ask about him when they, like, know that a phone call is supposed to happen or a visit. They can be easily distracted after the visits. Because they would be upset that they were leaving, but you could easily -- like, we could play a game in the car driving the half hour away, and they would be fine. After that they weren't upset anymore. They would have some behavioral issues afterwards but most of them could easily be addressed. During the visits they would run up and say, Hi, I love you, but they were more focused on playing a game or playing with the phones and things like that.

In addition, Ms. Hassan gave the following assessment of the relationship between Father and the children:

Q. Isn't it fair to say that [Father] and the children interacted well during the visits?
A. The children appeared to get on his nerves. He yelled at them multiple times. They interacted well when they were looking at stuff on the phone; but other than that, no.

17

As evidence that he has a meaningful relationship with his children, Father cites Ms. Hassan's testimony that daughter wrote a letter to Father telling him she loves and misses him, daughter asked if she could call her father, and that both children asked when they could go live with their father. The testimony cited by Father, however, does not establish a meaningful relationship; the record is clear that Father did not attend visits with the children until the petition for termination was filed, and that he did not attend IEP meetings, parent teacher conferences, or medical appointments. Considering the record as a whole, there is clear and convincing evidence that Father did not have a meaningful relationship with the children.

In addition to the specific factors, the record supports the findings as to other matters that the trial court held bore on the children's best interest. We agree with the trial court that the termination of Father's rights is in the best interest of the children.

## IV. CONCLUSION

For the foregoing reasons, the judgment terminating Father's parental rights on the grounds of persistence of conditions and abandonment by failure to provide a suitable home is reversed; in all other respects, the judgment is affirmed.

RICHARD H. DINKINS, JUDGE